UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

**GERRIE HALL**,                                              Case No. 6:15-cv-01525-KI

               Plaintiff,                          OPINION AND ORDER

    v.

**CAROLYN W. COLVIN, Acting
Commissioner of Social Security**,

             Defendant.


      Alan Stuart Graf, P.C.
      208 Pine St.
      Floyd, VA 24091

           Attorney for Plaintiff

      Billy J. Williams
      United States Attorney
      District of Oregon

Page 1 - OPINION AND ORDER

Janice E. Hebert
Assistant United States Attorney
1000 SW Third Ave., Ste. 600
Portland, OR 97204-2902

John C. Lamont
Special Assistant United States Attorney
Office of the General Counsel
Social Security Administration
701 Fifth Ave., Ste. 2900 M/S 221A
Seattle, WA 98104-7075

      Attorneys for Defendant

KING, Judge:

Plaintiff Gerrie Hall brings this action pursuant to section 205(g) of the Social Security

Act, as amended, 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the

Commissioner denying Hall's application for disability insurance benefits ("DIB").  I affirm the

decision of the Commissioner.

## BACKGROUND

Hall filed an application for DIB on February 15, 2012.  The application was denied

initially and upon reconsideration.  After a timely request for a hearing, Hall, represented by

counsel, appeared and testified before an Administrative Law Judge ("ALJ") on September 6,

2013.

On January 17, 2014, the ALJ issued a decision finding Hall was not disabled within the

meaning of the Act and therefore not entitled to benefits.  This decision became the final decision

of the Commissioner when the Appeals Council declined to review the decision of the ALJ on

June 12, 2015.

## DISABILITY ANALYSIS

The Social Security Act (the "Act") provides for payment of disability insurance benefits to people who have contributed to the Social Security program and who suffer from a physical or mental disability. 42 U.S.C. § 423(a)(1). In addition, under the Act, supplemental security income benefits may be available to individuals who are age 65 or over, blind, or disabled, but who do not have insured status under the Act. 42 U.S.C. § 1382(a).

The claimant must demonstrate an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to cause death or to last for a continuous period of at least twelve months. 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). An individual will be determined to be disabled only if his physical or mental impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).

The Commissioner has established a five-step sequential evaluation process for determining if a person is eligible for either DIB or SSI due to disability. The evaluation is carried out by the ALJ. The claimant has the burden of proof on the first four steps. *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007); 20 C.F.R. §§ 404.1520 and 416.920. First, the ALJ determines whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520(b) and 416.920(b). If the claimant is engaged in such activity, disability benefits are denied. Otherwise, the ALJ proceeds to step two and determines whether the claimant has a medically severe impairment or combination of impairments. A severe impairment is one

Page 3 - OPINION AND ORDER

"which significantly limits [the claimant's] physical or mental ability to do basic work activities[.]" 20 C.F.R. §§ 404.1520(c) and 416.920(c). If the claimant does not have a severe impairment or combination of impairments, disability benefits are denied.

If the impairment is severe, the ALJ proceeds to the third step to determine whether the impairment is equivalent to one of a number of listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. §§ 404.1520(d) and 416.920(d). If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled. If the impairment is not one that is presumed to be disabling, the ALJ proceeds to the fourth step to determine whether the impairment prevents the claimant from performing work which the claimant performed in the past. If the claimant is able to perform work she performed in the past, a finding of "not disabled" is made and disability benefits are denied. 20 C.F.R. §§ 404.1520(f) and 416.920(f).

If the claimant is unable to perform work performed in the past, the ALJ proceeds to the fifth and final step to determine if the claimant can perform other work in the national economy in light of his age, education, and work experience. The burden shifts to the Commissioner to show what gainful work activities are within the claimant's capabilities. *Parra*, 481 F.3d at 746. The claimant is entitled to disability benefits only if he is not able to perform other work. 20 C.F.R. §§ 404.1520(g) and 416.920(g).

## STANDARD OF REVIEW

The court must affirm a denial of benefits if the denial is supported by substantial evidence and is based on correct legal standards. *Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012). Substantial evidence is "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion" and is more than a "mere scintilla" of the evidence but less

than a preponderance.  *Id.* (internal quotation omitted).  The court must uphold the ALJ's

findings if they "are supported by inferences reasonably drawn from the record[,]" even if the

evidence is susceptible to multiple rational interpretations.  *Id.*

## THE ALJ'S DECISION

The ALJ identified rheumatoid arthritis as Hall's severe impairment.  The ALJ found

that the impairment did not meet or medically equal the requirements of any of the impairments

listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  Given this severe impairment, the ALJ

concluded Hall retained the residual functional capacity ("RFC") to perform light work.  She can

perform occasional postural activities such as climbing, balancing, stooping, kneeling, crouching,

and crawling.  She can perform frequent manipulation, such as frequent bilateral handling,

fingering, feeling, and bilateral reaching in all directions.  She can occasionally drive.  She

should avoid concentrated exposure to wetness and humidity, unprotected heights, and hazardous

or moving machinery.  She needs a sit or stand option where she can alternate positions every

one to three hours.

Given this RFC, the ALJ determined Hall could not perform her past work, but that she

could perform other work in the national economy such as information clerk, charge account

clerk, and food and beverage order clerk.

## FACTS

Hall was 50 years old as of her March 1, 2012 alleged onset date of disability.  She has a

high school degree and has worked as a dishwasher in a restaurant and as a housekeeper and

certified nurse aide at a number of nursing homes.  She also worked in a factory assembling

scanners.

She last worked as a certified nurse aide until February 2012, but took time off to care for

her sick father.  After he died, she did not return to work because she felt she could no longer

perform the work.

Prior to her alleged onset date of disability, Hall underwent physical therapy for a right

hip strain.  At the end of the series of sessions, in September 2011, Hall reported that her

"lumbosacral pain and right hip radicular symptoms" had "decreased to minimal levels[.]"  Tr.

326.  Physical therapy had met all of Hall's goals, including decreasing her pain levels from 7-

8/10 to 0-1/10.  In October 2011, after following up on chest pain (improved with

nitroyglycerin), she was described as "very active, no limitation."  Tr. 280.

In January 2012, Hall had a nodule removed from her left elbow, which was thought to be

a rheumatoid nodule.  She was tested and subsequently diagnosed with rheumatoid arthritis.  She

reported diffuse joint pain in her wrist, back, knees, feet and ankles, but she had mild swelling

only in her knees.  Her doctor, Stephan Ames, M.D., started her on Methotrexate.  The next

month, Hall noted the Methotrexate helped with the aching for two to three days, but that she felt

especially achy in her feet.  She had no swelling.  Dr. Ames recommended Naproxen.

Four months later, in June 2012, Hall told Dr. Ames that the Naproxen had helped and

that she felt less joint pain.  Her hands and wrists were not swollen, but she complained of pain.

Hall did not return to Dr. Ames until the following year, in January 2013.  At that time, she

reported pain in both feet for one week; she put her pain at 6/10 at rest and 8/10 when moving or

sleeping.  She had not had a flare of arthritis in her hands.  She had no swelling in her feet, her

straight leg raise was negative, and she demonstrated good motion in her knees. Dr. Ames gave her a prescription for hydrocodone, but warned her about long-term use.

Two weeks later, Hall returned to Dr. Ames complaining of pain in her knees and ankles, at a level of 9/10. Based on the laboratory findings, her rheumatoid arthritis was quiet, and Dr. Ames thought the pain may be due to osteoarthritis. Hall demonstrated a normal gait, she had no swelling in her knees, and no crepitation. Dr. Ames recommended Tylenol.

Hall followed up with Dr. Ames in April 2013, after she had been to the emergency room for a near-syncope episode. Dr. Ames worked to optimize Hall's blood pressure. Two months later, in June 2013, Hall reported blood pressure problems in the middle of the night, as well as increasing joint pain in her knee. Dr. Ames related no swelling or warmth in Hall's knee, but he did notice crepitation. Otherwise, her knees tested normal. Dr. Ames gave her a handicap parking permit and discussed the possibility of increasing her Methotrexate.

A month later, in July 2013, Hall continued to relate pain all over. Dr. Ames found no swelling in her legs, MCPs, or wrists. He did increase her Methotrexate to four tabs, and encouraged Hall to keep active.

Dr. Ames completed an RFC assessment, opining that Hall would have limitations in reaching, handling and fingering, and that Hall could only stand/walk about two hours in an eight-hour day, and sit about four hours in an eight-hour day. He thought she would miss work more than four days a month.

**DISCUSSION**

Hall challenges the ALJ's credibility analysis and disputes the ALJ's reasoning for accepting an examining physician's opinion over Dr. Ames' RFC.

Page 7 - OPINION AND ORDER

I.    <u>Credibility</u>

Hall completed a function report in May 2012 in which she indicated she cooked, cleaned, did the laundry and the dishes, vacuumed, dusted, swept and mopped, weeded flower beds, and that she cared for her boyfriend.  She spent between five minutes and an hour and a half cooking meals, such as soup, sandwiches, casseroles, and frozen dinners.  She also fed the dog and cat, brushed the dog and played with the dog.  She reported that her back, joint, and leg pain woke her up at night.  She could shop twice a month for between one and four hours.  She did not continue to do her hobbies "very often" or "very long"–including camping, fishing, crocheting, beading, gardening, and plastic canvas.  Tr. 203.  She reported hurting after an hour or so.  She socialized with her son and friends.

About a year and a half later, Hall appeared for a hearing with an ALJ.  She said she stopped working because of her arthritis and to care for her ill father.  She thought she could not lift ten pounds repetitively, she still took care of the cat and dog, and she no longer mopped the floor or vacuumed as much.  Hall and her boyfriend had a housekeeper come in to clean every other week.  She still cooked, but mostly used the microwave since the beginning of the year.  She stopped weeding the flower beds over the summer.  Hall still attended social events and took care of the grocery shopping.  In a typical day, Hall took her time getting up due to pain, but she then ate breakfast, took her medication, and got dressed.  If she wasn't hurting too badly, she would walk to get the mail.  Hall testified that she felt swollen joints about 20 days a month.  When her attorney asked Hall how long she could stand or be on her feet at one time, Hall testified "four hours, five hours[.]"  Tr. 53.  Then, when Hall's attorney expressed surprise, Hall clarified "for a continued time" she could stand "a couple of hours."  Tr. 53.  Hall later

explained, "I can stand for a couple of hours at a time when I'm not hurting really bad. When

I'm hurting real bad, I cannot stand for very long, no." Tr. 54. She said that when she performed

housework, she would be on her feet for maybe 30 minutes, then take a break. Hall thought she

could sit for an hour at a time. She thought she could combine sitting and standing for four or

five hours. She testified that she had problems dropping bowls and plates, and that her wrists

hurt with repetitive work. She no longer took narcotics because they made her feel fatigued.

The ALJ found Hall's testimony not entirely credible. Just prior to her alleged onset date,

Hall reported being "very active," and had no limitations. Tr. 17-18. She worked as a CNA just

before her amended disability onset date–work which involved lifting 100 pounds or more at a

time, extensive walking and standing, and very limited sitting. The ALJ opined that while Hall

may not be able to manage this level of work, the evidence supported a light work RFC. The

ALJ also mentioned Hall's medical treatment did not support the level of limitation Hall

reported. Finally, Hall's daily activities were inconsistent with her testimony.

When deciding whether to accept the subjective symptom testimony of a claimant, the

ALJ must perform a two-stage analysis. In the first stage, the claimant must produce objective

medical evidence of one or more impairments which could reasonably be expected to produce

some degree of symptom. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007). The

claimant is not required to show that the impairment could reasonably be expected to cause the

severity of the symptom, but only to show that it could reasonably have caused some degree of

the symptom. In the second stage of the analysis, the ALJ must assess the credibility of the

claimant's testimony regarding the severity of the symptoms. *Id.* The ALJ "must specifically

identify the testimony she or he finds not to be credible and must explain what evidence

undermines the testimony." *Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001).

General findings are insufficient to support an adverse credibility determination and the ALJ

must rely on substantial evidence. *Id.* "[U]nless an ALJ makes a finding of malingering based

on affirmative evidence thereof, he or she may only find an applicant not credible by making

specific findings as to credibility and stating clear and convincing reasons for each." *Robbins v.*

*Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).[1]

      The fact that, just before her amended disability onset date, Hall worked as a CNA lifting

100 pounds or more at a time, as well as meeting extensive walking and standing requirements, is

a clear and convincing reason to question the extent of her symptoms.  The ALJ agreed Hall

would not be able to return to this prior work (which required more lifting and positional

requirements than a light work RFC), but it was rational for the ALJ to question her testimony

when she demonstrated an ability to continue performing a demanding, physical level of work

just before she claimed an inability to do all work.[2]  Hall argues her condition progressed and that

she could work as a CNA at the initial stages of her disease, but this argument ignores the fact

that she initially alleged disability in January, while she was still working, that she displayed very

few objective signs of the disease throughout her treatment, and that her daily activities were

inconsistent with an inability to perform all work.[3]  The ALJ gave a specific, clear and

---

[1] The parties dispute whether SSR 96-7p applies, or whether the newer SSR 16-3p applies.  Application of either policy results in the same outcome.

[2] In her reply, Hall indicates that her termination was "September 3, 2010," but the same record reflects she performed CNA work until "3-8-12," which is seven days after her amended alleged disability onset date of March 1, 2012.  *Compare* Tr. 35 *with* Tr. 186.

[3] All of the definitions of rheumatoid arthritis Hall gives in her brief describe swollen and
(continued...)

convincing reason for rejecting Hall's testimony related to her symptoms from rheumatoid arthritis.

Additionally, medical evidence contradicted Hall's testimony. The ALJ pointed out that Hall reported daily swelling in her feet, although she had no swelling in her feet (and only mild swelling in her knees) when she was still working in January 2012. The ALJ identified inconsistencies between Hall's testimony and her reports to her physicians. For example, Naproxen helped Hall in June 2012. While she testified to "constant pain," she told Dr. Ames she had pain in her feet for one week, with no low back pain, and no arthritic flare in her hands, in January 2013. A few weeks later, Hall reported 9/10 pain in her knees and ankles, when (as the ALJ emphasized) a level 10 meant "extreme pain requiring emergency medical attention." Tr. 18. At that time, Hall demonstrated a normal gait with no swelling in her knees and ankles. (Dr. Ames recommended Tylenol.) Finally, despite reports of increased joint pain in June and July 2013, Hall's examination reflected no swelling in her knees, hands, legs or wrists. Regardless of whether the diagnosis is rheumatoid arthritis or osteoarthritis, the ALJ could rationally conclude the extent of the pain Hall described was not supported by objective evidence. *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1161 (9th Cir. 2008); *see also Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001) (ALJ cannot reject subjective pain testimony solely because it was not fully corroborated by objective medical evidence, but medical evidence is still a relevant factor in determining the severity of the pain and its disabling effects).

---

[3](...continued)
stiff joints, warmth, redness, swelling, puffiness, and pain, as well as weakened muscles, ligaments, and tendons. *See* Pl.'s Br. 8-9.

Finally, Hall's daily activities–particularly those she identified in her initial report in May 2012, but also those she described in her hearing testimony–are simply inconsistent with her testimony about extreme debilitating symptoms.  *See Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007).  In May 2012, Hall could perform all of her daily activities–including cooking, cleaning, laundry, weeding, and pet care.  Similarly, in her testimony, she testified to performing housework, cooking microwave meals, grocery shopping and socializing.  Although they should consume a "substantial part of [the claimant's] day," courts have held similar daily activities were sufficient evidence to support the ALJ's credibility finding.  *Compare Vertigan v. Halter*, 260 F.3d 1044, 1049 (9th Cir. 2001) (grocery shop with assistance, walk an hour in the mall, get together with friends, play cards, swim, watch television, and read were insufficiently substantial) *with Burch v. Barnhart*, 400 F.3d 676, 680 (9th Cir. 2005) (appropriate to consider ability to care for personal needs, cook, clean, shop, manage finances, interact with boyfriend); *see also Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999) (fix meals, do laundry, work in the yard, occasionally care for friend's child); *Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1175 (9th Cir. 2008) (cooking, cleaning, laundry, and managing finances, which are normal "activities[,] tend to suggest that the claimant may still be capable of performing the basic demands of competitive, remunerative, unskilled work on a sustained basis").  Hall has a different interpretation of the evidence, but the ALJ's conclusion that these daily activities were inconsistent with a finding of disability is just as rational.  *Molina*, 674 F.3d at 1110 (court must uphold findings if they "are supported by inferences reasonably drawn from the record").

In sum, the ALJ provided a number of clear and convincing reasons, supported by substantial evidence in the record, to find Hall capable of performing light work.

II.    <u>Medical Evidence</u>

During the hearing, the ALJ commented that the medical record was not extensive and that Dr. Ames' RFC was inconsistent with his own records.  For example, "The complaint about the hands, nowhere in the records, and suddenly he's got her reduced to 10 percent."  Tr. 60.  She agreed to give Hall time to set up a consultative physical examination with another provider.

Scott Thomas, D.O., examined Hall on October 5, 2013.  Hall reported good days–when she could perform normal tasks around the house–and bad days when she could not do perform any chores.  She reported pain in her elbows, hands, back, hips, knees and feet.  She took Naproxen and Methotrexate, which helped initially and then her symptoms returned in a few days.  She said she had left her CNA job when her dad died.  She could grocery shop, and she still crocheted and beaded, but was somewhat limited in these hobbies due to hand pain.  Hall could transfer herself from the chair to the examination table with mild difficulty and at a slower pace.  She could sit comfortably and take her shoes off without difficulty.  She could walk to the examination room, with a slowed gait, and perform a slow but stable tandem gait.  Dr. Thomas noted no swelling in her fingers, wrists, knees, or ankles.  She had mild crepitus in the right knee.  She could hop off both feet, could squat down to 70 degrees, and demonstrated mild instability with toe and heel gait.  She could grip and hold objects, as well as grasp and manipulate both large and small objects.  Dr. Thomas found no evidence of tenderness in her hands.  Hall was mildly tender throughout the lumbar paraspinal musculature.  Hall exhibited 5/5 muscle strength in the lower extremities, but her strength was lightly diminished in the upper extremities.  Grip strength was 5/5 bilaterally.  Dr. Thomas commented that Hall did not evidence poor effort or inconsistencies during the examination.  Dr. Thomas limited Hall to six hours standing/walking

Page 13 - OPINION AND ORDER

and six hours sitting.  He thought she could lift 20 pounds occasionally and 10 pounds frequently.  Her postural activities were limited to occasional.  She could frequently reach, handle, finger and feel.  The check-the-box form Dr. Thomas completed contained some inconsistencies from his narrative report.

The ALJ gave little weight to Dr. Ames' report, noting that his limitations were inconsistent with his observations of Hall during treatment, and that none of his examinations were as detailed or as complete as the one undertaken by Dr. Thomas.  Dr. Thomas's opinion, in contrast, was supported by a detailed examination of Hall and was consistent with her reported daily activities.  The ALJ did concede that the slight inconsistencies between Dr. Thomas' narrative report and his check-the-box form resulted in its being entitled to only partial weight.

The weight given to the opinion of a physician depends on whether the physician is a treating physician, an examining physician, or a nonexamining physician.  More weight is given to the opinion of a treating physician because the person has a greater opportunity to know and observe the patient as an individual.  *Orn*, 495 F.3d at 632.  If a treating or examining physician's opinion is not contradicted by another physician, the ALJ may only reject it for clear and convincing reasons.  *Id.* (treating physician); *Widmark v. Barnhart*, 454 F.3d 1063, 1067 (9th Cir. 2006) (examining physician).  Even if it is contradicted by another physician, the ALJ may not reject the opinion without providing specific and legitimate reasons supported by substantial evidence in the record.  *Orn*, 495 F.3d at 632; *Widmark*, 454 F.3d at 1066.  The opinion of a nonexamining physician, by itself, is insufficient to constitute substantial evidence to reject the opinion of a treating or examining physician.  *Widmark*, 454 F.3d at 1066 n.2.  Since Dr. Ames'

report is contradicted by other physicians, the ALJ was required to give specific and legitimate

reasons for rejecting his opinion.

The ALJ gave specific and legitimate reasons to give no weight to Dr. Ames' opinion and

partial weight to Dr. Thomas' opinion.  As the ALJ pointed out, the medical record reflected that

Hall could perform light work.  Tr. 18, 19 (commenting that the doctor's limitations were

inconsistent with his observations during treatment "discussed above").  Specifically, as the ALJ

discussed earlier in his opinion (and referenced in discussing Dr. Ames' opinion), Naproxen

helped Hall feel better in June 2012, no swelling was noted in her hands and wrists, she had not

had a flare of arthritis in her hands in January 2013 and had pain in her feet for one week.

Despite reporting pain at 9/10 in her knees and ankles a few weeks later, she had normal gait and

no swelling in her knees and ankles.  She displayed 5/5 strength in her lower extremities in April

2013, and she complained of pain all over in July 2013 but had no swelling in her hands, legs or

wrists.  The ALJ could rationally reject the restrictive sitting, standing, walking and manipulation

limitations identified by Dr. Ames as inconsistent with his own medical records when the only

objective indication of Hall's impairment was crepitus in her right knee.  *See also* Tr. 60 (ALJ

commented during the hearing, for example, "The complaint about the hands, nowhere in his

records, and suddenly he's got her reduced to 10 percent."); *Tommasetti v. Astrue*, 533 F.3d

1035, 1041 (9th Cir. 2008) ("ALJ is the final arbiter with respect to resolving ambiguities in the

medical evidence"); *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004)

(contradictory clinical findings may be specific and legitimate reason).

Dr. Thomas, on the other hand, carefully documented Hall's normal grip strength, motor

strength, as well as her lifting and postural limitations with specific tests meant to capture Hall's

capabilities.  The ALJ was entitled to rely on Dr. Thomas' observations–based on testing– about Hall's functionality and the severity of her impairments.  Additionally, Dr. Thomas' opinion was consistent with Hall's own reports about her daily activities, which were consistent with light work.  *Ghanim v. Colvin*, 763 F.3d 1154, 1162 (9th Cir. 2014) (inconsistency between daily activities and a treating provider's opinion may constitute specific and legitimate reason to discount opinion).

Hall points to the inconsistencies between Dr. Thomas' narrative report and his check-the-box form as an indication of the lack of professionalism displayed by Dr. Thomas.  As a practical matter, however, the inconsistencies are–as the ALJ described–minimal and the ALJ gave Hall the benefit of lighter lifting limitations and the lesser walking/standing/sitting limitations.  Dr. Thomas accounted for Hall's slowed gait and mild postural difficulty in his narrative report–postural limitations which the ALJ accepted.

In sum, the ALJ gave specific and legitimate reasons to accept Dr. Thomas' opinion over Dr. Ames' opinion.


///


///


///

## CONCLUSION

The findings of the Commissioner are based upon substantial evidence in the record and

the correct legal standards.  For these reasons, the court affirms the decision of the

Commissioner.

IT IS SO ORDERED.

DATED this _____12th_____ day of December, 2016.


_/s/ Garr M. King_____
Garr M. King
United States District Judge


Page 17 - OPINION AND ORDER